UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF LOUISIANA

```
-----------------------------------------------------------x
In re:                                          :    CASE NO. 13-12120
                                                :
LEVEL III TRADING PARTNERS, L.P.                :    CHAPTER 11
                                                :
            DEBTOR                              :    SECTION "A"
-----------------------------------------------------------x

PATRICK C. COTTER, IN HIS                            ADVERSARY NO.
CAPACITY AS TRUSTEE OF THE                           15-1068
LEVEL III TRADING PARTNERS, L.P.
LITIGATION TRUST

                    PLAINTIFF

VERSUS

JENNIFER JUNG

                    DEFENDANT
```

## MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

**NOW INTO COURT,** through undersigned counsel, comes Defendant, Jennifer Jung, who submits her Memorandum in Support of Motion for Summary Judgment on the basis that Petitioner's claims against Ms. Jung, arising under the Alabama Uniform Fraudulent Transfer Act, fail as a matter of law. Specifically, Petitioner's claims under Petitioner's claims for fraudulent transfer under Ala. Code § 8–9A–4(c), 5(a), and 5(b) are untimely and have extinguished under Ala. Code § 8–9A–9, which sets forth the applicable statute of limitations for fraudulent transfer actions.

1

**RELEVANT FACTS**

This litigation arises from a fraudulent Ponzi scheme perpetrated by an Alabama limited partnership, Level III Trading Partners, L.P. (hereinafter, "Debtor" or "Level III"), and its general partner, Bruce Gwyn.[1] On June 22, 2007, Bruce Gwyn registered the hedge fund known as Level III Trading Partners, L.P. ("Level III" or the "Fund") with the National Futures Association ("NFA").[2] Level III attracted approximately $2.7 million in capital from innocent investors -- one of which was Defendant, Jennifer Jung.[3]

Like many investors in Level III, Ms. Jung made a capital contribution to the Fund through execution of a subscription agreement which granted Ms. Jung an equity interest in Level III denominated as a limited partnership interest. Ms. Jung's initial investment in Level III was in the amount of $75,000, contributed in September 2008.[4] In April 2011, Ms. Jung invested another $15,000 in Level III.[5]

In June 2012, Level III was subjected to a surprise audit by the NFA. The audit uncovered evidence that Mr. Gwyn personally misappropriated moneys from Level III, failed to disclose the nature of Level III's investments to investors, and misled investors as to the value of the Fund.

---

[1] Statement of Uncontested Facts #1; *See* "Complaint for Avoidance of Transfer," Case No. 15-1146, Rec. Doc. 1, ¶1.
[2] Statement of Uncontested Facts #2; *See* **Exhibit "A"** - Affidavit of NFA Manager, Compliance Department, Bates No. JUNG000138- JUNG000148, ¶¶ 3-4.
[3] Statement of Uncontested Facts #4; *See* "Complaint for Avoidance of Transfer," Case No. 15-1146, Rec. Doc. 1, ¶2.
[4] Statement of Uncontested Facts #5; *See* **Exhibit "C"** - Affidavit of Jennifer Jung; *see also* **Exhibit "D"** - Email from Bruce Gwyn and attached documents, including Level III Executive Summary and Subscription Agreement, Bates No. JUNG000001-29.
[5] Statement of Uncontested Facts #12; *See* **Exhibit "K"**- Level III Subscription Agreement dated April 20, 2011, Bates No. JUNG000126; *see also* **Exhibit "L"**-Treaty Energy Corporation Stock Subscription Agreement, Bates No. JUNG000131-33; Exhibit "C"-Affidavit of Jennifer Jung; *In Re: Level III Trading Partners, L.P.*, U.S.B.C. (E.D. LA 2015), Case No. 13-12120, Rec. Doc. 257, "Declaration of Bruce Gwyn," p. 2 (certifying that Ms. Jung has a claim for unpaid distributions from the Fund in the amount of $19,213.71).

On August 2, 2013, a group of eight limited partners/investors in Level III filed a Petition for Involuntary Bankruptcy, which was subsequently converted to a voluntary Chapter 11 on October 1, 2013. A plan of liquidation was approved and Patrick C. Cotter (Petitioner herein) was appointed as Plan Trustee. Ms. Jung did not receive any mailings from the Bankruptcy Court; thus, she was completely unaware of what was going on in the bankruptcy.

Bruce Gwyn filed Proof of Claim 22-2 on behalf of Ms. Jung in the amount of $19,213.71.[6] Ms. Jung's Claim 22-2 was converted to an equity claim by Order of this Court dated February 3, 2015.[7]

On April 10, 2015, Petitioner instituted several adversary proceedings seeking to avoid and recover distributions that the Debtor had made to several investors. Four (4) years and nine (9) days after the *last* transfer to Ms. Jung -- Petitioner filed this Complaint for Avoidance of Transfers.[8]

Petitioner claims that the transfers to the investors, which occurred prior to the collapse of the Ponzi scheme, are "fraudulent transfers" under 11 U.S.C. § 548 (a)(1)(A) and applicable state law. Among the adversary actions instituted by the Trustee was this action against Ms. Jung, which seeks to recover three (3) distributions made to Ms. Jung in 2010 and 2011. Specifically, Petitioner seeks to recover from Ms. Jung a distribution of $20,000 to Ms. Jung on September 1, 2010, a distribution of $50,000.00 on January 28, 2011, and a distribution of $21,196.00 on April 1, 2011.[9]

The 2010 and 2011 distributions to Ms. Jung total $91,196.00. Of the $91,196.00 distributed to Ms. Jung, $90,000.00 represents a return of Ms. Jung's investments in Level III;

---

[6] Statement of Uncontested Fact #19; *See,* **Exhibit "N".**
[7] Statement of Uncontested Fact #20; *See,* **Exhibit "O".**
[8] Statement of Uncontested Fact #18; *See* "Complaint for Avoidance of Transfer," Case No. 15-1146, Rec. Doc. 1.
[9] *See* "Complaint for Avoidance of Transfer," Case No. 15-1146, Rec. Doc. 1.

$1,196 represents purported investment gains (*i.e.*, fictitious profits from the Fund). Significantly, at the time of the distributions, Ms. Jung was completely unaware of any misappropriations or fraudulent actions on the part of Bruce Gwyn or Level III.[10]

## STANDARD OF REVIEW

Summary judgment is available if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. of Civ. P. 56. The moving party has an initial burden of demonstrating the absence of a genuine issue of material fact.[11] Once the moving party establishes that insufficient evidence is within the record to support an essential element of the opposing party's claim, the burden shifts to the non-moving party.[12] The non-movant must then demonstrate that an issue of fact does exist, by identifying specific facts on the record or by submitting additional evidence.[13]

## LAW AND ARGUMENT

Petitioner's action, which seeks to have three transfers from Level III to Ms. Jung voided as fraudulent, is governed by the provisions of the Alabama Uniform Fraudulent Transfer Act, Ala. Code §§ 8-9A-1 *et seq.* ("AUFTA" or the "Act").[14] The purpose of AUFTA is to prohibit the fraudulent transfer of property by a debtor who intends to defraud creditors by placing assets

---

[10] *See* "Affidavit of Jennifer Jung,", attached as Exhibit "C" to the Statement of Undisputed Material Facts.
[11] *Imperial Trading Co., Inc. v. Travelers Prop. Cas. Co. of Am.*, 638 F.Supp.2d 692, 696 (E.D.La.2009); *See also, Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
[12] *Imperial Trading Co., Inc.*, 638 F.Supp.2d at 693-94.
[13] *Id.* at 694.
[14] *See* **Exhibit "O"**- *In Re: Level III Trading Partners, L.P.*, U.S.B.C. (E.D. LA 2015), Case No. 13-12120, Rec. Doc. 270, "Reason for Decision," p. 6 (holding that "…Alabama law 'governs relations among the partners of [the] limited partnership and between the partners and the limited partnership.").

4

beyond their reach.[15] The Trustee does not have a claim under any of the provisions of the AUFTA; and thus, the Trustee does not have a claim against Ms. Jung.

### A. Liability Under AUFTA

AUFTA's statutory scheme includes four different types of 'fraudulent transfers' upon which liability may be predicated.[16] AUFTA is derived from the Uniform Fraudulent Transfer Act ("UFTA"), which has been adopted by 43 states and the District of Columbia. Cases interpreting UFTA are persuasive authority for the operation of AUFTA where the language of AUFTA mirrors that of UFTA.[17]

#### 1. Alabama Code Section 8-9A-4(a)

First, a debtor's transfer is fraudulent as to a creditor whose claim arose before or after the transfer if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor.[18] This type of claim, found under Ala. Code § 8–9A–4(a), is classified as a claim for *actual* fraudulent transfer.[19] A claim for actual fraudulent transfer under § 8–9A–4(a) is extinguished unless the action is brought within six years after the transfer of personal property was made.[20] Recovery under this section is further limited by § 8-9A-8(a), which provides:

> A transfer is not voidable under Section 8-9A-4(a) against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee who took in good faith.

According to these statutes, the Trustee must prove: (1) Gwyn made the transfer with the actual intent to hinder, delay or defraud any creditor; (2) Jung was not in good faith when she

---

[15] *SE Property Holdings, LLC v. Braswell*, 2013 WL 4498700, * 2 (S.D. AL) (citing *American National Red Cross v. ASD Specialty Healthcare, Inc.*, 888 So.2d 464, 465 (Ala. 2003)).
[16] *SE Property Holdings*, 2013 WL 4498700 at * 2 (citing *American National Red Cross v. ASD Specialty Health Care, Inc.*, 325 F. Supp .2d 1322, 1336 (S.D. Ala. 2002)).
[17] *In re Vista Bella, Inc.*, 511 B.R. 163, 193 (Bankr. S.D. Ala. 2014)(citing.*Horton v. Alexander*, 977 So.2d 462, 465 (Ala. 2007)).
[18] *SE Property Holdings*, 2013 WL 4498700 at * 2 (citing Ala. Code § 8–9A–4(a)).
[19] *SE Property Holdings*, 2013 WL 4498700 at * 2.
[20] Ala. Code § 8–9A–9(2).

5

received the distribution; and (3) Jung did not receive reasonably equivalent value in the return of her funds. The Trustee will be unable to demonstrate these three elements for the following reasons:

    a. Gwyn has repeated asserted that he did not intend to hinder, delay or defraud anyone.

    b. Jung was in good faith when she received the distribution, as evidenced by the numerous factors stated above, including but not limited to:

        a. After receiving a distribution of her full investment, Jung invested new money into the Fund. [21]

        b. After receiving a distribution of her full investment in the Fund, Jung purchased 10,000 shares of Treaty Energy Corporation.[22]

Applying these facts, it is undisputed that the Trustee **cannot demonstrate** that (1) Gwyn made the transfer with the actual intent to hinder, delay or defraud any creditor; (2) Jung was not in good faith when she received the distribution; and (3) Jung did not receive reasonably equivalent value in the return of her funds. Accordingly, the Trustee is not entitled to recovery against Jung under Ala. Code § 8-9A-4(a), and any claims under Ala. Code §8-9A-4(a) must be dismissed.

**2. Alabama Code Section 8-9A-4(c)**

"Second, a debtor's transfer is fraudulent as to a creditor whose claim arose before or after the transfer 'if the debtor made the transfer without receiving a reasonably equivalent value ... and the debtor [either] [w]as engaged or about to engage in a business or a transaction for

---

[21] Statement of Uncontested Facts #12; *See* **Exhibit "K"-** Level III Subscription Agreement dated April 20, 2011, Bates No. JUNG000126; *see also* **Exhibit "L"**-Treaty Energy Corporation Stock Subscription Agreement, Bates No. JUNG000131-33; Exhibit "C"-Affidavit of Jennifer Jung; *In Re: Level III Trading Partners, L.P.*, U.S.B.C. (E.D. LA 2015), Case No. 13-12120, Rec. Doc. 257, "Declaration of Bruce Gwyn," p. 2 (certifying that Ms. Jung has a claim for unpaid distributions from the Fund in the amount of $19,213.71).

[22] *See* "Affidavit of Jennifer Jung," ¶ 7, attached as Exhibit "C" to the Statement of Undisputed Material Facts.

which the remaining assets of the debtor were unreasonably small ... or ... [i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.'"[23] This type of claim, found under Ala. Code § 8–9A–4(c), is classified as a claim for *constructive* fraudulent transfer.[24] A claim for constructive fraudulent transfer under Ala. Code § 8–9A–4(c) is extinguished unless the action is brought within four years of the transfer when the action is brought by a creditor whose claim arose before the transfer was made,[25] or within one year after the transfer was made when the action is brought by a creditor whose claim arose after the transfer was made.[26]

For the reasons discussed in this memorandum, the Fund received reasonably equivalent value in exchange for the transfer. Accordingly, the Trustee is not entitled to recovery under § 8-9A-4(c), and any claims under Ala. Code §8-9A-4(c) must be dismissed.

### 3. Alabama Code Section 8-9A-5(a)

"Third, a debtor's transfer is fraudulent as to a creditor whose claim arose before the transfer 'if the debtor made the transfer without receiving a reasonably equivalent value ... and the debtor was insolvent."[27] This type of claim, found under Ala. Code § 8–9A–5(a), is similarly classified as a claim for *constructive* fraudulent transfer.[28] A claim for constructive fraudulent transfer under Ala. Code § 8–9A–5(a) is extinguished unless the action is brought within four years after the transfer was made.[29]

---

[23] *SE Property Holdings*, 2013 WL 4498700 at * 2 (citing Ala. Code § 8–9A–4(c)).
[24] *SE Property Holdings*, 2013 WL 4498700 at * 2.
[25] Ala. Code § 8–9A–9(3).
[26] Ala. Code § 8–9A–9(4).
[27] *SE Property Holdings*, 2013 WL 4498700 at * 2 (citing Ala. Code § 8–9A–5(a)).
[28] *SE Property Holdings*, 2013 WL 4498700 at * 2.
[29] Ala. Code § 8–9A–9(3).

For the reasons discussed in this memorandum, the Fund received reasonably equivalent value in exchange for the transfer. Accordingly, the Trustee is not entitled to recovery under § 8-9A-5(a), and any claims under Ala. Code §8-9A-5(a) must be dismissed.

4. **Alabama Code Section 8-9A-5(b)**

"Fourth, a debtor's transfer is fraudulent as to a creditor whose claim arose before the transfer 'if the transfer was made to an insider for an antecedent debt and the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent.'"[30] This type of claim, found under Ala. Code § 8–9A–5(b), is classified as a claim for "insider" constructive fraudulent transfer.[31] A claim for insider constructive fraudulent transfer under Ala. Code § 8–9A–5(b) is extinguished unless the action is brought within one year after the transfer was made.[32]

The Trustee cannot recover from Jung under § 8-9A-5(b) unless his is able to demonstrate that she knew the Fund was insolvent when she received the distributions. The Trustee will be unable to do so.

Ms. Jung received monthly and quarterly statements regarding her Level III investment, which perpetuated the illusion that the Fund had moderate investment gains, kept Ms. Jung from seeking recovery of her equity investment, and kept Ms. Jung (and numerous other innocent investors) from questioning the legitimacy of the business.[33] By letter dated March 25, 2009, Ms. Jung received a 2008 Schedule K Form from Level III, further validating the legitimacy of the

---

[30] *SE Property Holdings*, 2013 WL 4498700 at * 2 (citing Ala. Code § 8–9A–5(b)).
[31] *SE Property Holdings*, 2013 WL 4498700 at * 2.
[32] Ala. Code § 8–9A–9(5).
[33] *See* **Exhibit "E"** - Level III Monthly and Quarterly Statements, attached *in globo*, Bates No. JUNG000030-44, JUNG000049-95, JUNG000100-114, JUNG000119-124, and JUNG000127-130; *see also* Exhibit "C" - Affidavit of Jennifer Jung.

Fund.[34] In August 2010, Ms. Jung received an Account Statement from the Fund, which reflected that her investment had a net gain of $19,230 in July 2010.[35]

At no time prior to receiving payments from the Fund did Ms. Jung know or suspect that the Fund and/or Bruce Gwyn were operating a fraudulent scheme. Moreover, at no time prior to receiving payments from the Fund did Ms. Jung know or suspect that the Fund was insolvent. Rather, Ms. Jung believed the Fund was legitimate and performing well, relying upon the veracity of monthly and quarterly Account Statements she received from the Fund, which reflected that the Fund had a net asset value of $1,696,930.40 on July 31, 2010; $1,427,936.00 on September 30, 2010; $1,602,655.00 on October 31, 2010; $1,685,388.00 on November 30, 2010; $1,272,493.00 on December 31, 2010; $1,197,869.00 on January 31, 2011; $1,321,148.00 on February 28, 2011; and $1,495,356.00 on March 31, 2011.[36]

Ms. Jung, in fact, was so convinced in the legitimacy of Mr. Gwyn and the Fund that she reinvested $15,000 in the Fund on April 20, 2011, and further invested another $20,000.00 with Gwyn on February 1, 2012, purchasing 588,235 shares of stock in Treaty Energy Corporation (another entity of which Mr. Gwyn was Co-CEO/Director).[37] The transfers to Ms. Jung, which occurred on September 1, 2010, January 28, 2011, and April 1, 2011, were made twenty (20) to

---

[34] See **Exhibit "F"** - 2008 Schedule K Form from Level III, Bates No. JUNG000045-48; *see also* Exhibit "C," Affidavit of Jennifer Jung.
[35] *See* Exhibit "E" - Account Statement dated June 30, 2010, Bates No. JUNG000094-95; *see also* Exhibit "C," Affidavit of Jennifer Jung.
[36] *See* Exhibit "E"- Level III Monthly and Quarterly Statements, attached *in globo*; *see also* Exhibit "C" - Affidavit of Jennifer Jung.
[37] *See* **Exhibit "K"-** Level III Subscription Agreement dated April 20, 2011, Bates No. JUNG000126; *see also* **Exhibit "L"**-Treaty Energy Corporation Stock Subscription Agreement, Bates No. JUNG000131-33; Exhibit "C"- Affidavit of Jennifer Jung; *In Re: Level III Trading Partners, L.P.*, U.S.B.C. (E.D. LA 2015), Case No. 13-12120, Rec. Doc. 257, "Declaration of Bruce Gwyn," p. 2 (certifying that Ms. Jung has a claim for unpaid distributions from the Fund in the amount of $19,213.71).

fourteen (14) months *prior to* the audit, when Ms. Jung was first put on notice of alleged improprieties, misconduct, and fraudulent activities on the part of Bruce Gwyn and the Fund.[38]

Even if this Court were to find that Ms. Jung has reasonable cause to believe that the Fund was insolvent when the distributions were made, §8-9A-9 sets the statute of limitations, and provides that:

> A claim for relief with respect to a fraudulent transfer under this chapter is extinguished unless action is brought:
>
> \*\*\*
>
> (5) Under Section 8–9A–5(b), within one year after the transfer was made.

According to the statute, any claim brought under § 8–9A–5(b) must be asserted within one year of the transfer. Alabama Code § 8–9A–9(5). The alleged fraudulent transfer to Ms. Jung occurred in the Winter and Spring of 2011. The Trustee's adversary proceeding asserting the fraudulent transfer claim was not filed until April 10, 2015. Thus, 8–9A–5(b) is clearly not available to the Trustee.

### B. Defenses Under 11 U.S.C. § 548(C) and AUFTA

Under 11 U.S.C. § 548(c) of the Bankruptcy Code, even when a debtor has made a fraudulent transfer, an innocent recipient of that transfer is able to retain what it received if the conditions set out in section 548(c) are met. Section 548(c) states:

> [A] transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c).

---

[38] *See* **Exhibit "C,"** Affidavit of Jennifer Jung.

Thus, while § 548(a) "affords creditors a remedy for the debtor's fraudulence or, as the case might be, mere improvidence," section 548(c) "protects the transferee from his unfortunate selection of business partners."[39]

To establish its entitlement to the section 548(c) defense, a transferee must prove that it provided value in good faith for the transfer.[40] "The term 'value' is defined to include 'satisfaction or securing of a present or antecedent debt of the debtor.'"[41] "Although antecedent debt is not defined, the term 'debt' is stated to include 'liability on a claim,' 11 U.S.C. § 101(12), and 'claim' is broadly defined as the 'right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.' 11 U.S.C. § 101(5)."[42]

Like § 548(c) of the Bankruptcy Code, AUFTA similarly provides a good faith affirmative defense to a transferee. Specifically, as to claims of actual fraudulent transfer under § 8-9A-4(a), a transfer is not voidable against a person who "took in good faith and for a reasonably equivalent value," as set forth below:

> (a) A transfer is not voidable under Section 8-9A-4(a) against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee who took in good faith.

Ala. Code § 8-9A-8(a).

This defense may be resolved on summary judgment.[43]

As set forth above, both the Bankruptcy Code and AUFTA provide that a transferee who took in good faith and for value is entitled to retain the transfer. "In the case of Ponzi schemes,

---

[39] *Williams v. FDIC* (*In re Positive Health Management*), 769 F.3d 899, 903 (5th Cir. 2014)(citing *Jimmy Swaggart Ministries v. Hayes* (*In re Hannover Corp.*), 310 F.3d 796, 802 (5th Cir. 2002)).
[40] I*n Williams v. FDIC* (*In re Positive Health Management*), 769 F.3d 899, 903 (5th Cir. 2014)(citing In re Am. Hous. Found., 544 Fed.Appx. 516, 520 (5th Cir.2013) (per curiam)).
[41] *Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011) (citing 11 U.S.C. § 548(d)(2)(A)).
[42] *Perkins*, 661 F.3d at 626-627.
[43] *See Iberiabank v. Polk*, 2013 WL 5701084, *8 (M.D. AL).

11

the general rule is that a defrauded investor gives 'value' to the Debtor in exchange for a return of the principal amount of the investment, but not as to any payments in excess of principal."[44] "Courts have recognized that defrauded investors have a claim for fraud against the debtor arising as of the time of the initial investment."[45] "Thus, any transfer up to the amount of the principal investment satisfies the investors' fraud claim (an antecedent debt) and is made for 'value' in the form of the investor's surrender of his or her tort claim. <u>Such payments are not subject to recovery by the debtor's trustee.</u>"[46]

Federal courts have generally followed a two-step process in determining liability of an investor in the case of fraudulent Ponzi schemes: "First, to determine whether the investor is liable, courts use the so-called 'netting rule.'"[47] "Amounts transferred by the Ponzi scheme perpetrator to the investor are netted against the initial amounts invested by that individual. If the net is positive, the receiver has established liability, and the court then determines the actual amount of liability, which may or may not be equal to the net gain, depending on factors such as whether transfers were made within the limitations period or whether the investor lacked good faith. If the net is negative, the good faith investor is not liable because payments received in amounts less than the initial investment, being payments against the good faith losing investor's

---

[44] *Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011) (citing, *e.g., Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008); *Scholes v. Lehmann*, 56 F.3d 750, 757–58 (7th Cir. 1995)).
[45] *Perkins*, 661 F.3d at 627 (citing *Jobin v. McKay (In re M & L Business Mach. Co., Inc.*), 84 F.3d 1330, 1340–42 (10th Cir. 1996); W*yle v. Rider (In re United Energy Corp.*), 944 F.2d 589, 596 (9th Cir. 1991) (noting that investors in a fraudulent scheme clearly had claims for rescission and restitution ... regardless of whether there existed a contractual right to the return of principal)); *see also In Williams v. FDIC (In re Positive Health Management*), 769 F.3d 899, 901 (5th Cir. 2014).
[46] *Perkins*, 661 F.3d at 627 (citing *Donell*, 533 F.3d at 772; *In re M & L Business Mach. Co.*, 84 F.3d at 1342; *In re United Energy*, 944 F.2d at 595-596; *Eby v. Ashley*, 1 F.2d 971 (4th Cir. 1924)).
[47] *Donell*, 533 F.3d 762, 771 (9th Cir. 2008) (citing Mark A. McDermott, Ponzi Schemes and the Law of Fraudulent and Preferential Transfers, 72 Am. Bankr. L.J. 157, 168–69 (1998) (surveying federal district court and bankruptcy cases)).

as-yet unsatisfied restitution claim against the Ponzi scheme perpetrator, are not avoidable within the meaning of UFTA."[48]

"Second, to determine the actual amount of liability, **the court permits good faith investors to retain payments up to the amount invested, and requires disgorgement of only the 'profits' paid to them by the Ponzi scheme.**"[49] "Payments of amounts up to the value of the initial investment are not, however, considered a 'return of principal,' because the initial payment is not considered a true investment. Rather, investors are permitted to retain these amounts because they have claims for restitution or rescission against the debtor that operated the scheme up to the amount of the initial investment. Payments up to the amount of the initial investment are considered to be exchanged for 'reasonably equivalent value,' and thus not fraudulent, because they proportionally reduce the investors' rights to restitution."[50] Since investors' rights to restitution are proportionately reduced by payments received from a Ponzi scheme, to the extent of invested principal, payments from the debtor are deemed to be made in exchange for reasonably equivalent value."[51]

With respect to "good faith," the Bankruptcy Code does not define "good faith," a term which is not susceptible of precise definition and which is generally determined on a case-by-case basis.[52] However, under the case law, "good faith" is construed as having an objective component.[53] In Ponzi scheme cases, if the circumstances would place a reasonable person on

---

[48] *Donell*, 533 F.3d at 771-772 (citing Cal. Civ. Code § 3439.04(a)(2) (holding that only payments made "[w]ithout receiving a reasonably equivalent value" are avoidable as fraudulent transfers); *United Energy*, 944 F.2d at 597 (holding there has been no fraudulent transfer to a good faith investor where a Ponzi scheme makes payments that total less than that investor's initial investment)).
[49] *Donell*, 533 F.3d at 772 (citing *In re Lake States Commodities, Inc.*, 253 B.R. 866, 872 (Bankr.N.D.Ill.2000) (collecting cases)).
[50] *Donell*, 533 F.3d at 772 (citing *United Energy*, 944 F.2d at 595).
[51] E.g., Wyle v. C.H. Rider & Family (In re United Energy Corp.), 944 F.2d 589, 595 (9th Cir.1991); Jobin v. Cervenka (In re M & L Business Machine Co.), 194 B.R. 496, 502 (D.Colo.1996)
[52] *Brown v. Third Nat'l Bank (In re Sherma*n), 67 F.3d 1348, 1355 (8th Cir. 1995).
[53] *Jobin v. McKay (In re M & L Business Machine Co*.), 84 F.3d 1330, 1335 (10th Cir.1996).

inquiry of a debtor's fraudulent purpose, and if a diligent inquiry would have discovered the fraudulent purpose, then the challenged transfer is fraudulent.[54] Some factors relevant to the analysis are the defendant's experience as an investor, whether the debtor promised rates of return greatly exceeding market rates, whether the debtor provided implausible explanations as to how it could pay those extremely high rates, and factors that would indicate insolvency, such as a debtor's use of postdated checks or history of dishonored checks.[55]

### C. Ms. Jung Took in Good Faith.

Ms. Jung is entitled to retain the transfers from Level III up to the amount of her $90,000 investment because she took in good faith and for reasonably equivalent value. With respect to good faith, the undisputed evidence demonstrates that Ms. Jung took the transfers in good faith. As set forth in her Affidavit, Ms. Jung had limited investment experience.[56] By all accounts, Gwyn was a successful Tulane graduate, an NASD Series-3 qualified broker, and a registered Introducing Broker of the U.S. Commodity Futures Trading Commission ("CFTC") and member of the NFA.[57] After investing in the Fund, Ms. Jung received credible monthly and quarterly statements from the Fund, which perpetuated the illusion that the Fund had moderate investment gains, kept Ms. Jung from seeking recovery of her equity investment, and kept Ms. Jung (and numerous other innocent investors) from questioning the legitimacy of the business.[58] She properly received a Schedule K Form relating to her investment.[59] Moreover, there were no excessive returns reported on Ms. Jung's account statements that should have put her on notice

---

[54] *McKay*, 84 F.3d at 1338–39.
[55] *See, e.g., McKay*, 84 F.3d at 1338–39.
[56] *See* "Affidavit of Jennifer Jung," ¶ 1, attached as Exhibit "C" to the Statement of Undisputed Material Facts.
[57] *See* "Affidavit of Jennifer Jung," ¶ 1, attached as Exhibit "C" to the Statement of Undisputed Material Facts.
[58] *See* "Affidavit of Jennifer Jung," ¶ 2, attached as Exhibit "C" to the Statement of Undisputed Material Facts.
[59] *See* "Affidavit of Jennifer Jung," ¶ 3, attached as Exhibit "C" to the Statement of Undisputed Material Facts.

that something was amiss.[60] Nor were there any facts indicating that Level III was insolvent, such as a debtor's use of postdated checks or history of dishonored checks.

In addition, Ms. Jung's Affidavit clearly establishes that at no time prior to receiving payments from the Fund did she know or suspect that the Fund and/or Bruce Gwyn was operating a fraudulent scheme, misappropriating funds, or involved in any improprieties relating to the Fund and/or her investment; and that at no time prior to receiving payments from the Fund did she know or suspect that the Fund was insolvent.[61] Rather, Ms. Jung believed the Fund was legitimate, relying upon the veracity of monthly and quarterly Account Statements she received from the Fund, which reflected that the Fund had a net asset value of $1,696,930.40 on July 31, 2010; $1,427,936.00 on September 30, 2010; $1,602,655.00 on October 31, 2010; $1,685,388.00 on November 30, 2010; $1,272,493.00 on December 31, 2010; $1,197,869.00 on January 31, 2011; $1,321,148.00 on February 28, 2011; and $1,495,356.00 on March 31, 2011.[62] Ms. Jung, in fact, was so convinced in the legitimacy of Mr. Gwyn and the Fund that – after receiving a full distribution of her interest in the Fund - she reinvested $15,000 in the Fund on April 20, 2011, and further invested another $20,000.00 with Mr. Gwyn on February 1, 2012, purchasing 588,235 shares of stock in Treaty Energy Corporation (another entity of which Mr. Gwyn was Co-CEO/Director).[63]

Petitioner can point to no evidence that Ms. Jung knew or objectively should have known of the unlawful nature of the Fund.

---

[60] *See* "Level III Monthly and Quarterly Statements," attached *in globo* as Exhibit "E" to the Statement of Undisputed Material Facts.
[61] *See* "Affidavit of Jennifer Jung," ¶ 7, attached as Exhibit "C" to the Statement of Undisputed Material Facts.
[62] *Id.*
[63] *Id.*

15

**D. Ms. Jung Provided Reasonably Equivalent Value for the Transfers.**

As an unwitting investor in Level III's fraudulent scheme, Ms. Jung clearly has claims for rescission and restitution of her principal investment of $90,000. Consequently, any transfers up to the value of her investment in Level III ($90,000) satisfy her fraud claim against Level III, and were made for "reasonably equivalent value" in the form of Jung's surrender of her restitution claim. Consequently, such payments are not subject to recovery by the debtor's trustee.[64]

**E. Petitioner Has no Viable Claims Under 11 USC §548.**

11 USC §548 provides, in pertinent part:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition…

11 USC §548(a)(1).

As set forth in the plain language of §548, a trustee is only entitled to avoid transfers that were made within two years before the date of the filing of the Involuntary Petition. The Involuntary Petition in this case was filed on August 2, 2013. In the case of Ms. Jung, all transfers took place more than two years prior to that date. Consequently, Petitioner has no cause of action against Ms. Jung under §548.

## CONCLUSION

Petitioner's state law claims against Jennifer Jung should be dismissed with prejudice, as the undisputed evidence demonstrates that Jennifer Jung is entitled to the affirmative defenses provided in 11 U.S.C. § 548(c) and Ala. Code § 8-9A-8(a).

---

[64] *See Perkins*, 661 F.3d at 627; *see also Donell*, 533 F.3d at 772 ("Payments up to the amount of the initial investment are considered to be exchanged for 'reasonably equivalent value,' and thus not fraudulent, because they proportionally reduce the investors' rights to restitution.")

Respectfully submitted:

**KINGSMILL RIESS, L.L.C.**

By: *s/ Christy R. Bergeron*
Marguerite K. Kingsmill (Bar #7347)
Christy R. Bergeron (Bar #22944)
201 St. Charles Avenue, Suite 3300
New Orleans, Louisiana 70170
Telephone: (504) 581-3300
Facsimile: (504) 581-3310
E-mail: mkingsmill@kingsmillriess.com
E-mail: cbergeron@kingsmillriess.com

*Attorneys for Jennifer Jung*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 24th day of March, 2016, I electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*s/ Christy R. Bergeron*
Christy R. Bergeron