# AFFIDAVIT

THE AFFIANT, JOY BOND, BEING DULY SWORN AND UNDER OATH STATES THAT:

1. My name is Joy Bond, and I am employed by National Futures Association ("NFA") as a Manager in the Compliance Department. In my capacity as a Manager in the Compliance Department, I was in charge of an audit of Level III Management LLC ("L3M"), a registered commodity pool operator ("CPO") and commodity trading advisor ("CTA") and NFA Member; Level III Trading LLC ("L3T"), a registered introducing broker ("IB") and NFA Member.

Background

2. L3M is an NFA Member CPO and CTA located in Metairie, Louisiana. L3M became registered as a CPO and approved as an NFA Member on July 3, 2007. On June 9, 2009, L3M registered as a CTA. Since August 2007, L3M has operated one pool, Level III Trading Partners LP ("L3LP" or "the Fund"). Based on information L3M reported to NFA in 2011, the Fund at that time had about 24 investors and valued its assets at about $1.7 million.

3. L3T is an NFA Member IB, which is also located in Metairie, Louisiana and operates out of the same office as L3M. L3T registered as an IB and an NFA Member on June 22, 2007. L3T was a guaranteed IB of MF Global, Inc. ("MFG"), until early November 2011 when RJ O'Brien Associates LLC ("RJO") became its guarantor. At the time of NFA's most recent audit, L3T had only two active accounts, both of which were for individuals who are also participants in L3LP.

4. Bruce A. Gwyn ("Gwyn") has been the sole AP and principal of both L3M and L3T since the inception of the firms. Gwyn has also been an NFA Associate since June 2007.

5. On June 4, 2012, NFA commenced an unannounced examination of L3M. The examination was prompted by L3M's failure to file pool quarterly reports ("PQRs"), which are due to NFA within 45 days after the end of each quarterly reporting period, and its failure to file a certified annual pool financial statement ("PFS") for L3LP, which was due 90 days after the pool's fiscal year ended on December 31, 2011. L3M previously filed a 2010 audited PFS for L3LP with NFA, which included a statement from the independent certified public accountant ("CPA") stating the CPA was unable to provide a value for certain assets held by the Fund and, as a result, the CPA issued the Fund a qualified opinion.

11



EXHIBIT "A"

JUNG000138

6. Gwyn was not present when NFA arrived at the firms' business location listed in NFA's Online Registration System ("ORS"), which also happens to be Gwyn's home. Therefore, NFA attempted to contact Gwyn at the telephone number listed in ORS, but the number was disconnected. NFA finally reached Gwyn on his cell phone and learned he was at the airport in Atlanta, Georgia. Gwyn stated he was commencing a trip to California with his family and did not plan to return home until June 12, 2012, even though NFA advised Gwyn that his presence at the audit location and availability to the audit team were necessary.

7. NFA also questioned Gwyn during the call about the Fund's late filings. In response, Gwyn represented that the Fund ceased conducting commodity futures business in 2011 and that he intended to deregister as a CPO and delist the pool after submitting all overdue filings to NFA. Gwyn also indicated that L3M had shared this information with the Fund's investors in a letter dated May 22, 2012.

8. Gwyn also explained that the Fund's previous administrator had terminated its relationship with L3M in 2011. Gwyn stated that the former administrator had difficulty valuing many of the Fund's assets, which consisted mainly of investments in private companies. As a result, the administrator ceased creating performance reports, and the Fund's participants have not received any pool account statements since June 2011.

9. NFA reiterated the importance and urgency of the audit to Gwyn and indicated NFA would provide him with a list of documents NFA required in connection with the audits of L3M and L3T. Later, after the call ended, NFA sent Gwyn a list of the initial documents NFA required, which included a current balance sheet for the Fund, all supporting documents for the Fund's asset balances, and the names and contact information for all of the Fund's participants. The request also specified a 5:00 p.m. deadline on June 5, 2012 for production of these records.

10. NFA continued its audit work on June 4th by conducting a teleconference with the Fund's new administrator and outside counsel. The new administrator represented that L3M and Gwyn had retained the administrator in March 2012 to assist with the Fund's filings that were due to NFA for calendar year 2011 only. The new administrator indicated that it had duplicated books and records the previous administrator had completed through June 2011 and created records from source documents for the time after June 2011.

11. L3M's outside counsel indicated that L3M and Gwyn had retained his services in April 2012 regarding the Fund's late PQRs, as well as its 2011 annual certified PFS. The attorney informed NFA that he had sent two

JUNG000139

notifications to the Fund's participants since April, consisting of an e-mail to inform participants that L3M had retained his law firm to resolve the late filing of the 2011 PFS and an update to inform participants about the status of the annual PFS and the IRS Schedule K-1 filings.

Misappropriation of L3LP's Funds

12. On June 4th, L3LP's new administrator provided NFA with an unaudited December 31, 2011 balance sheet, which valued the Fund at $1.7 million. In reviewing the balance sheet, NFA noticed that L3LP listed an asset at MFG valued at more than $40,000. However, since the account at MFG had transferred to RJO in November 2011, NFA independently contacted RJO to verify the account's value as of December 31st. Contrary to the balance sheet provided, NFA found the Fund only had about $1,600 in its RJO futures account as of December 31, 2011, and that the Fund subsequently withdrew those monies three days later – on January 3, 2012. Furthermore, NFA obtained bank records for L3LP that show a corresponding $1,600 deposit denoting the return of those monies from the Fund's RJO account to L3LP. However, the very same day, the Fund issued two checks totaling $1,500 – one check for $1,000 made payable to "cash" and the other check for $500 made payable to "Ann Marie Gwyn" ("A. Gwyn"), who presumably is Gwyn's wife – which essentially exhausted these funds.

13. A review of the bank records for L3M, L3LP and Gwyn revealed several other instances of irregular cash activity in the nature of withdrawals from the Fund's bank account between December 2011 and February 2012 where monies went to Gwyn, A. Gwyn, or "cash." NFA also saw payments from the Fund for Gwyn's personal expenses that included food, gas and spa services, and totaled over $200,000.

14. In several instances, NFA found that transfers to Gwyn's personal bank occurred soon after deposits were credited to L3LP's bank account. For example, on December 21, 2011, the Fund received a wire from Alpine Securities Corporation ("Alpine"), the securities firm that holds certain L3LP investments, for $44,000 that represented the proceeds of securities liquidated on December 16, 2011. The very next day, the Fund transferred $44,000 to Gwyn's personal bank account. When NFA questioned Gwyn about this transaction, he claimed the $44,000 represented monies owed to him. However, Gwyn has provided no documentation concerning that indebtedness, no evidence that he owned the securities in question, and it appears that his personal investment in the Fund was around $2,500 and nowhere near $44,000 that he alleges belonged to him.

JUNG000140

15. Not even two months later – in February 2012 – the Fund's financial records indicate that Gwyn was again apparently using the Fund's bank account for his personal benefit. Specifically, on February 9th, the Fund received a $12,000 wire transfer from Alpine for securities liquidated on February 3rd, and the next day received a $20,000 wire transfer from an individual who Gwyn represented bought certain securities – which happened to be restricted shares – directly from the Fund. Over the next few days, virtually all of these monies were withdrawn. A portion of these monies (i.e., $10,000) was distributed to a pool participant on February 10th. However, it appears that Gwyn used the remaining amount (i.e., $22,000) for his personal benefit. Specifically, NFA noted that Gwyn withdrew $22,000 from the Fund's bank account through checks payable to himself or cash, and via a telephone transfer to his personal bank account. Neither Gwyn nor L3M have provided an explanation regarding these withdrawals to Gwyn's benefit.

16. In addition to the aforementioned withdrawals that directly benefited Gwyn, the Fund's cash activity illustrates that the Fund was low on cash and needed monies from new investors to meet redemption requests. For example, at the start of April 2011, the Fund had a $9,000 balance in its bank account and on April 5th it received $30,000 in customer deposits. However, the Fund's bank records show that a check made payable to another investor for almost $22,000 cleared on April 11th. This cleared check, however, pre-dated the April 5th deposit and, therefore, this activity indicates that L3LP had to await the receipt of funds from one investor to fulfill a pool redemption request for another investor since, without the April 5th deposit, L3LP did not have sufficient liquid assets available to honor the withdrawal request.

17. Other transactions that occurred in late January through mid-February 2012 are equally problematic and troubling. Specifically, the Fund's January 31, 2012 bank account balance totaled less than $50. Even so, L3M issued a check that day from the Fund's bank account for almost $9,000 as a tax payment to the IRS, in response to a "Notice of Intent to Levy" property that L3LP had received in December 2011. On February 9th, the Fund accepted a $9,000 deposit from an unknown source presumably to cover the IRS payment. NFA learned from Gwyn that the IRS payment represents a penalty the Fund incurred because Gwyn had failed to timely file IRS Form 1065 for the partnership, which was the responsibility of Gwyn on behalf of L3M, not the Fund's investors. Furthermore, despite NFA's request, Gwyn has failed to provide any support as to the nature of the $9,000 deposit.

14

### Failing to Disclose the Nature of the Fund's Risky Investments to Participants and Misleading Participants as the Fund's Value

18. NFA's investigation noted that the Fund's last disclosure document filed with and accepted by NFA is dated December 1, 2009 and states that L3LP will generally "...invest approximately 90% to 100% of its assets in commodity futures and 0 to 10% of its assets in private securities..." Although the DD indicates these percentages may be more or less at the discretion of the L3LP's investment manager, L3LP's current investments are nowhere close to these stated investment parameters. Specifically, NFA found that the Fund currently is not invested in any commodity futures contracts and the vast majority of the Fund's purported assets are almost 100% invested in two penny stocks which, as described below, are significantly overvalued on the Fund's balance sheet.

19. NFA's investigation also found that Gwyn has relationships – most of which Gwyn has not disclosed to the Fund's participants – with many of the entities in which the Fund has invested. For example, Gwyn is co-chief executive officer of one company and a director of another. Gwyn also acts as an agent for at least one other company and is a member of at least one limited liability company (LLC) in which the Fund has invested. Additionally, Gwyn has failed to disclose to the Fund's participants material information about another individual, Andrew V. Reid ("Reid"), who along with Gwyn has served as an officer, director, agent or in another capacity for virtually every entity for which the Fund has invested. What the Fund's participants do not know – because it has not been disclosed – is that the Financial Industry Regulatory Authority ("FINRA"), through its predecessor, the National Association of Securities Dealers ("NASD"), permanently barred Reid in July 2004 from associating in any capacity with any FINRA/NASD member firm due to his conversion of customer funds. NFA also discovered that Alpine, the securities firm that holds L3LP's securities investments, has been disciplined 38 times by FINRA (or NASD) for various rule violations, many of which relate to the sale of unregistered securities.

20. Equally concerning, and to further shed light on the dubious nature of L3M's and Gwyn's investments, is the fact that two over-the-counter ("OTC") traded companies in which the Fund is invested requested relief from the Securities and Exchange Commission ("SEC") for their most recent fiscal year-end filing requirements because of supposed "financial hardships." In fact, the most recent 10-Q filings with the SEC included "going concern" notations for both entities, where the notation in the 10-Q for one company mentioned the firm's "limited operating capital with no current revenue" from operations. NFA learned that this company, which formerly engaged in selling coffee and coffee related products, merged with an entity that specializes in the purchase and development of commercial properties and supposedly is currently financing the

15

redevelopment of a New Orleans theater damaged by Hurricane Katrina. Similarly, the 10-Q filing for the other company indicated that "substantial doubts existed" as to the company's ability to carry on due to "continuing negative cash flows from operations and a working capital deficit as of September 30, 2011." This company recently completed a "reverse merger" to change its focus from "hydrogen production and fuel cell development" to oil and gas development, and Reid recently provided Gwyn with a balance sheet for this company showing it has negative equity of $638,000.

21. As noted above, the Fund's current administrator provided NFA with an unaudited balance sheet that valued the Fund at $1.7 million. However, NFA estimates that the current value of the Fund's total assets is actually closer to $200,000, at best. Specifically, L3LP's current assets consist of two OTC penny stocks for which L3M and Gwyn report a combined value of about $1 million. NFA's assessment of those investments, however, actually values them at far less than $1 million after looking up the current stock price on the OTC bulletin board, receiving copies of stock certificates for these OTC investments, verifying reported stock liquidation information, and factoring in that some of the certificates involve restricted securities, where the investment essentially has no current value while the restriction is in place.

22. The Fund's remaining purported assets are in several privately held companies, and the $650,000 value listed for them by L3M and Gwyn on the Fund's December 31, 2011 balance sheet is equally dubious. These ventures include purported investments in oil and energy companies, as well as holdings in a management company for businesses that "own and operate specialty retail meat locations" and a production company that apparently offers a travelling magician. NFA currently questions both the existence and valuation of these assets since L3M and Gwyn have not provided any current bank statements or other supporting documents from independent sources to demonstrate that the Fund was actually invested in these ventures in 2011 and, if so, the value of the investments. Consequently, NFA considers these assets to have no current market value.

23. In addition, the Fund's bank account apparently had less than $100 as of December 31, 2011. Further, for most of 2012, the bank account's month-end balance totaled less than $50 or the account was overdrawn, as is currently the case.

24. Despite L3M's and Gwyn's unsupported and vastly overstated valuation for the Fund, NFA learned through interviews with several Fund investors that Gwyn provided participants with the December 31st balance sheet valuing the Fund at $1.7 million. In addition, at least one participant indicated that Gwyn provided him with a balance sheet dated February 29,

16

2012 valuing the Fund at $3.7 million. Although L3M and Gwyn have failed to provide this balance sheet to NFA, they obviously are continuing to falsely promote that the Fund's investments are significantly increasing in value.

25. Moreover, based on interviews with several investors, it appears that Gwyn has recently made varying forms of verbal disclosure to some investors about certain, but not all, of the Fund's investments and his association with those companies. For example, Gwyn disclosed the Fund was moving away from commodity futures to interests in oil and stock companies and other securities, but he did not provide more details about these companies and the extent to which the Fund had invested in them. In addition, Gwyn failed to disclose the details of Reid's and Alpine's role in the investments and their disciplinary history, and did not explain the basis for the valuation of the Fund's current assets.

26. NFA also reviewed certified annual PFSs that L3M has filed with NFA since the Fund's inception in 2007. According to these PFSs, participant contributions to the Fund have totaled over $2.7 million since 2007, while participant withdrawals amounted to almost $2.4 million over the same period. NFA has reviewed some redemption requests for the Fund and believes that Gwyn has used the grossly overinflated Fund values to honor these redemption requests which, based on NFA's calculation of the Fund's assets, have likely exceeded the true value of participants' interests in the Fund.

27. NFA has also learned that at least one Fund participant recently requested to redeem his interest in the Fund, which he currently values at about $129,000 based on information provided by Gwyn. However, as demonstrated by NFA's calculations described above, that withdrawal would likely consume almost 65% of the pool's assets and exceed the investor's pro rata share of his investment in the Fund.

### Gwyn's and L3M's Failure to Cooperate and Providing Misleading Information to NFA

28. L3M's registration records indicate that an individual named James Anthony Ghio ("Ghio") was pending at various times between April 2007 and June 2010 as an AP and principal of L3M and L3T. However, NFA initiated a registration action to deny Ghio registration since he was subject to a 1977 bar from the NASD. Although Ghio eventually withdrew his AP application, his association with L3M and L3T raises additional concerns since one of the Fund's investors informed NFA that Ghio claimed to be the Fund's trader. In addition, several investors indicated to NFA that Ghio solicited their investment in the Fund. This information contradicts Gwyn's representations that Ghio is not acting in a capacity that requires Commodity Futures Trading Commission registration and Gwyn's claim that Ghio "has never solicited" investors.

17

JUNG000144

29. To date, Gwyn has not made himself available in person to answer critical questions about L3M's and L3T's activities. In addition, L3M and Gwyn have failed to cooperate promptly and fully in NFA's investigation and have not provided support for the vast majority of the assets in which the Fund is invested or documents to support various deposits and withdrawals to the Fund's or Gwyn's bank accounts. Furthermore, L3M and Gwyn have failed to provide any internal support, including balance sheets and income statements for the Fund since its December 31, 2011 fiscal year end. These failures have impeded NFA's efforts to determine the nature of all transactions and the true net asset value of L3LP. L3M and Gwyn have also provided misleading information to NFA, as well as indirect and contradictory responses to questions NFA has posed throughout its investigation.

30. Moreover, it appears that L3M and Gwyn have misappropriated investors' funds and misrepresented the Fund's valuation to investors. In addition, L3M and Gwyn have failed to produce critical documents that NFA has requested from them to determine the extent to which L3M and Gwyn have misappropriated funds.

Further Affiant sayeth not.

_____
Joy Bond

Subscribed and sworn to before me
on this 12th day of June 2012.

_____
Notary Public

OFFICIAL SEAL
MARGARET A VANDERMYDE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 03/15/2014

18

JUNG000145

JUNG000146

## AFFIDAVIT OF SERVICE

I, Nancy Miskovich-Paschen, on oath state that on June 12, 2012, I served copies of the attached Notice of Member Responsibility Action and Associate Responsibility Action Under NFA Compliance Rule 3-15, by sending such copies by e-mail and regular mail, first-class delivery, in envelopes addressed as follows to:

David Stawick
Office of the Secretariat
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581
E-mail: dstawick@cftc.gov

Tempest Thomas
Office of Proceedings
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581
E-mail: tthomas@cftc.gov

and by sending such copies by e-mail and overnight delivery, in envelopes addressed as follows to:

Level III Management LLC
Level III Trading LLC
220 Hector Avenue
Metairie, LA 70005
Attn: Bruce Gwyn
E-mail: bgwyn@level3trading.com

Simon Riveles, Esq.
Riveles Law Group
1115 Broadway
12th Floor
New York, NY 10010
E-mail: simon@riveleslawgroup.com

*Nancy Miskovich-Paschen*
Nancy Miskovich-Paschen

Subscribed and sworn to before me
on this 12th day of June 2012.

*Margaret A. Vandermyde*
Notary Public

OFFICIAL SEAL
MARGARET A VANDERMYDE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 03/15/2014

JUNG000147

National Futures Association
300 South Riverside Plaza
Suite 1800
Chicago, Illinois 60606
Attn: Legal Department-Docketing

E-Mail: Docketing@nfa.futures.org
Facsimile: 312-781-1672

Aggrieved parties may petition the CFTC for a stay of this MRA and ARA pending a hearing pursuant to and in conformity with the terms set forth in CFTC Regulation 171.41.

NATIONAL FUTURES ASSOCIATION

Date: 6-12-12         By: _____
                          Daniel J. Roth, President

m/cxc/MRAs/Level III MRA 06 11 12